of the morning is United States of America v. Jason Dvorin and also United States of America v. Mindy Sauter. May it please the court. Mr. Dvorin didn't receive a fair trial in 2013 and he didn't receive a fair trial on remand. There isn't any doubt in this case that Mr. Dvorin submitted a lot of checks that nobody believed would clear. The government's view of the case both here and below seems to be that this is a sufficient case of bank fraud, that this independently proves bank fraud. But this ignores an important intent element, which is Mr. Dvorin's intent to deceive the bank, his knowledge that Mr. Darrington was deceiving the bank, and his knowledge that Mr. Darrington was not acting on the bank's behalf and for its benefit. Mr. Dvorin was entitled to a fair trial on this question, but he was deprived of that fair trial on that question, first in 2013, by a course of conduct by the government that tended to conceal and suppress the plea agreement supplement of its star witness in this case, who was the only testifying witness who knew what the conversations were between Mr. Darrington and Mr. Dvorin. And on remand, he was deprived of a fair trial by two related procedural errors that tended to relieve the government of its burden of proof on that disputed intent element. First, the prosecution was permitted to bombard the jury with questions and testimony that equated bad checks with fraud and that identified the defendant's conduct as fraud. Second, the defense was denied an instruction on apparent authority, which would have required the government to disprove Dvorin's reliance on Darrington's authority, even as the government received an instruction, much touted by the government at closing, that no officer could validate a fraud. It's important... Didn't your client get the instruction that he needed, which is that he had to believe he was violating the law? And that would cover... I mean, it is true that Darrington didn't have the authority to authorize a fraud on the bank, but if Dvorin can believe that, the jury believed that he believed that, then the good-faith instruction would have caused them to acquit. Well, Mr. Dvorin's defense was not that he believed Darrington was authorized to validate a fraud on the bank. It was his defense was he believed that Mr. Darrington was acting on the bank's behalf, that he — that Mr. Darrington was not — that the government couldn't show, anyway, that Mr. Darrington was deceiving the bank. A jury might abstract that principle from the good-faith instruction, even though that's about what the defendant believes about the law, rather than what he believes about that factual question. No. I mean, it's whether the defendant thought his conduct, including doing whatever Darrington tells him, violates the law. And if he thought Darrington had the authority to do that — I mean, like, if I went in and got a loan from a bank that it turned out that guy didn't have the power to give me, my defense to theft would be, well, this guy gave me a loan, I signed a piece of paper, I walked out with $10,000, thought it was all good. And so the authority issue wouldn't be the question. The question would be my intent. If I knew that guy was just giving me money from the bank, then I'd be part of the fraud. If not, then not. And so it's a focus on me. And why isn't that instruction focusing on Mr. Dvorin good enough? Well, from a — a lay juror's perspective, which of these two instructions is going to speak more directly to the question of — of his reliance on apparent authority? Number one, a good-faith instruction that says he has to believe his conduct is illegal. Or number two, an instruction that says no bank officer can validate a fraud. The second question which the government — the second instruction which the government received speaks more directly to the question of whether or not Mr. Darrington was — its knowledge tended to present a defense to Mr. Dvorin. The government's instruction said specifically the knowledge of a bank — of a bank officer is not a defense to bank fraud. So a jury might say, well, yes, but — but I can take this abstract good-faith instruction and use that to mean that Mr. Dvorin has to know he's not deceiving the bank. But — but a reasonable juror, a lay juror, would probably look at the — the validation of a fraud instruction as the more precise instruction that deals with that — that deals with that question. What's your best case for the argument that Darrington had apparent authority to do what he did and that instruction should have been given? Well, the — the most precise case on that is Melloware. I mean, the — the — it says essentially in — in terms that a defendant's — that the government has to disprove the defendant's reliance on — on the authority of — of a bank officer. It has to prove that he knew that this was not something that the bank as a whole was sponsoring or that — that it was accepting. That — that — that's an unpublished case, but it's the most precise case. The — the — the published authority would just be the — the authority that defines the elements of bank fraud, which says that the defendant has to have the intent to deceive and to — But you got that. I mean, you got even better than that, because a lot of times, you know, ignorance of the law is no defense, the lawdy died. Here we have this actual instruction. He doesn't know he's violating the law. And if he thinks everything's cool, the bank's okay with this, it's kind of an informal loan relationship. If the jury believed that, they would have to acquit him on the charge that it was given. This — to me, that — that would implicate the line of authority in this case — of and not merely abstractly, which is — which is United States v. Lewis. Those are the cases cited in the brief. And the most specific information provided to the jury is that he could not validate a fraud. That is a particularly — the jury instructions in this case are particularly troubling when they are combined with the prosecution strategy of consistently bombarding the jury with questions and testimony that equate bad checks and fraud. Because if the jury is conditioned to think that all bad checks are fraud or that a lot of them, anyway, put together are necessarily fraud, that these are fraudulent checks, irrespective of the defendant's intent, and it hears that a bank officer cannot validate a fraud, then he's almost syllogistically guilty. It doesn't matter what Mr. Darrington is — what he believes about Mr. Darrington. If bad checks are fraud and a bank officer cannot validate a fraud, then his knowledge — then what he thinks about Mr. — Mr. Darrington is doing and Mr. Darrington's defense to his charge. I would like to switch subjects, of course, others may have questions as well, but I wanted to ask about the forfeiture issue. It kind of seems like that Judge O'Connor felt like by granting the new trial or agreeing to the new trial, it was kind of no harm, no foul in terms of let's just have a do-over on this plea agreement issue, supplemental plea agreement. But we know that then the forfeiture count was added. Did you argue to the district court that as a sanction for the Brady et al. violations, the forfeiture count should be taken away? Did you make that argument? Yes. So where in the record did you make that? Because I'm having a little trouble finding where you made that precise — that forfeiture — because, you know, there was this 1927 argument about you can't assess monetary damages against the prosecutor herself, but it seems to me that taking the forfeiture count out would sort of be monetary sanctions of a sort that you may can do. And did you — I guess I'm looking for where in the record you made that so I can study that a little bit better. We argued below that the government should not be permitted to profit from its Brady and Napier errors in the objection to the forfeiture. Let me see if I can find that for you. If you want to look when you sit down and give it to us on the rebuttal, that's fine. I won't take the time on it. Thank you very much. I believe that'll be in — I believe that'll be in 2486 to 2492. But is that different from being vindictive? You're saying they cannot profit from — is different from being vindictive and adding more charges? Those are independent arguments. So one of them is that because of the particular nature of the error, because this error is so serious and stems from the government rather than the court, that the government should not be able to profit by adding a forfeiture count. On the other hand, you have — in any kind of legal error, it is — it gives rise to a potential presumption of vindictiveness for them to add charges after a remand or vacature of a conviction. On the vindictiveness, does it matter that your client got six months less? No, that's — And I'd probably pay $90,000 for six months less. Well — And on balance, did he really get a more — a heavier sentence? That is not — that would be relevant to a question of judicial vindictiveness. It would be very relevant to a question of judicial vindictiveness. But the question here is the government is adding charges, is adding the — is adding a potential punishment exposure, and it didn't know that it was — that the defendant's sentence was going to go down. So the question is, would a reasonable defendant in the future who is considering making such a sensitive claim, such a difficult claim of government misconduct on appeal, would their suspicion that — or their concern about vindictiveness be allayed by the fact that the court ultimately gave him 18 months less? And I don't think that it would, because that did not stem from the — from government conduct. That stemmed from the — the district court's reevaluation of the sentence, ultimately. There are four facts that are all recognized as persuasive in this Court's precedent that combine to give rise to a very strong perception or concern about vindictiveness to an objective observer. Number one, and this distinguishes a lot of the government's authority, is that the and not merely his refusal to plead. This is not a plea bargaining. There's not an increase in charges due to plea bargaining. Number two is the additional punishment exposure was for identical conduct. They didn't even charge a new offense. It is the same elements giving rise to an additional penalty. There is virtually no government authority that says that you do not produce a presumption of vindictiveness that is on comparable facts, where it is identical conduct, identical elements, increased punishment. Is a forfeiture the same as adding additional charges? There weren't any additional charges. It was a forfeiture. Does that make it different from adding additional charges that could add punishment as opposed to a forfeiture? Not at all. The point is that what we're trying to avoid in vindictiveness is a concern of — that the defendant is going to be punished for exercising his — successfully exercising his appellate rights. So the fact that the defendant isn't charged with anything wouldn't allay their concern. The gravamon is increased punishment or increased exposure to punishment. But if we conclude that if you're really going to say no harm, no foul, you have to strike the forfeiture more in the nature of a sanction or more in the nature of just putting you back really where you were, we don't need to reach vindictiveness. That's right. We don't. But vindictiveness might be the — I mean, the vindictiveness question might be the easier finding to make because it's only a presumption of vindictiveness. It's a prophylactic rule that's being — that exists in the present. You don't actually have to find — you don't even have to find that there was a Brady violation in order to find that a reasonable defendant would be concerned about vindictiveness for raising a claim. But, I mean, the reason that — as I understand it, that sanctions were not assessed is that the judge felt like the harm, which was, you know, not being able to fully examine Darrington about the supplemental plea, was cured by the new trial. And your argument, then, as I appreciate it now, and I'm going to look at whether you really raised it in the district court, is not really because now we've got this extra thing here of this forfeiture. That is one argument, but I'm saying that we don't — you don't have to find that there was government misconduct in order to find that there's a risk of vindictiveness for asserting as much. But vindictiveness doesn't make the prosecutors look very good, either. So, I mean, they're both — they're both species of the prosecutor messing up, just different in terms, Brady versus vindictive. I don't know. Neither one sounds too good to me if I'm a prosecutor. And I think that that gets to sort of the element in the room, which is the most persuasive reason that a hypothetical defendant would be concerned by this course of events if they were considering raising a comparable claim, which is the very sensitive nature of the appellate claim that was being raised. This was not merely an evidentiary error. This was a claim that the government sponsored false testimony in the first trial. How do you respond to the fact that supposedly a new group of — a USA, a new AUSA, not the same one took over the case? There was a new independent prosecutor that looked at the case and thought that forfeiture had been overlooked and should be included in the charges. Does that make a difference? I think their position is, well, it was someone new that came and took a new look at the case and looked at it independently and thought that they had overlooked adding forfeiture to it. So it was not a vindictive situation. It's of extremely slight weight. The criminal chief, the head of the — the chief of the criminal division entered an appearance in this case before the forfeiture notice was added. So it is clear that the entire office was prosecuting this case on remand. All the prosecutors in the same office was Sauter? I mean, it wasn't somebody from a different district or something? Not the same — not a different district, but they were from Fort Worth. Fort Worth, okay. It's a different division. It's a different division of the same district, under the same U.S. attorney. Right. But five new government lawyers entered appearances after the show cause hearing in this case. And I think it is — it is not credible to say that — that the fact that a district court suggested there might be personal sanction, personal monetary liability for a line prosecutor did not change the tone of this — of this litigation and that it would not give rise to a concern by a defendant, to a hypothetical defendant, that — that that fact was being — was very important to the government's conduct. If you take on the office, the office is going to come after you. That's right. Thank you. Thank you, Mr. Page. Mr. Hastings. May it please the Court, I represent Appellant Mindy Sautter, who was the prosecutor in the first trial against Mr. DeVoren. And where is she now? I don't mean right this minute, I mean in general, because it says former prosecutor. Yes, Your Honor. She is in private practice at a small firm in Dallas. Ms. Sautter is appealing the findings from the district court that have had an impact on her reputation and her career. Today, I hope to hit all three of the main issues in the case, but I want to just briefly say what I think are the most important points on each issue. First, there was no false testimony in the first case. The problem with the argument that Mr. DeVoren is presenting is it's trying to pull testimony out of the context under which it was presented, and the problem with the district court's findings, which are not the same as what Mr. DeVoren is arguing, is that it fails to recognize that there were no, in fact, any promises made related to sentencing leniency or moving for leniency. On the Brady issue, yes, there was a mistake. A document was failed to be turned over. Everyone acknowledges the mistake. Ms. Sautter testified and admitted that in court. But the document was never suppressed. That's a key point, because the document that was missed was expressly referenced in Darrington's plea agreement that Mr. DeVoren's counsel had and was using in the first trial. So there is no Brady violation, and it also was not material for reasons we've discussed in the brief. And finally, the last major topic, before I come back to more detail on these issues, is recklessness, which is a big point. The Dallas Morning News ran articles talking about my client acting in reckless disregard of her duties, and if you run a Google search, that's the first thing that comes up under her name. No one is defending that recklessness finding in this case. And in fact, if you look at the record, there's no evidence to support a recklessness finding. The only evidence is that someone made an unintentional mistake, and as a result, this proceeding went forward, but there's no evidence of intent. The district court found there was no bad faith. All that happened is someone made a mistake, and that is not enough to have a recklessness finding. But isn't the quantum of mental state quintessentially something a district judge is better suited to determine than the three of us hundreds of miles removed from the situation? Your Honor, if we had a situation where there was competing evidence on both sides and there was assessments of credibility in going into that, I may agree. Here, we have no competing evidence. We have unequivocal testimony. But an interested witness says, I didn't mean to do it. Isn't that quintessentially the kind of thing you look in their eye and you go, well, okay, I don't think you, like, meant to in an intentional sense, but you really weren't paying sufficient attention because this is not just one page and thousands of pages that somehow didn't get photocopied. This is kind of an important document to the key witness in the case. So doesn't that by itself support the notion that if she didn't mean to do it, she was major league reckless in not doing it? And, Your Honor, I would respectfully disagree. First, this is an important document. I'll talk about that one second. But it is two pages and over 10,000 pages produced. As far as this document goes, though, there was no intent, as my client testified to, to withhold it, and it could not possibly have been intentionally suppressed for a couple of reasons. First, the plea agreement itself, paragraph eight, expressly says the document exists and has been filed with the court. Paragraph eight says not only will it be filed, it's filed in every case in the district. We're talking about a supplement that is the standard practice of the office that they file in every single case. So then all the more reason why it should be, like, the first thing that's produced. I mean, this isn't, like, we've all been in cases where there's 10,000 e-mails and then there's always some stray e-mail somebody didn't produce or didn't find or blah, blah, blah. This is not like that. This is one of the core documents. That's why I don't view it the same as the other 10,000 that may have been produced. And, Your Honor, first, as far as comparing this document to the other 10,000, I will agree with you. It's not the same as every other document produced. However, when you look at this particular material, part of the reason it is missed is a mistake is made. The Devorins Counsel has the supplement, I'm sorry, has the plea agreement that references the supplement. When there's follow-up, they're saying, have you produced everything? There's nothing, no one, my client did not realize it wasn't produced. Mr. Devorins Counsel has the plea agreement, is using the plea agreement, never once said, did you get, where's the supplement? I think you missed it. There was nothing to call Ms. Sauter's attention or anyone of the government's attention to that document as being missed. It was simply a document that was missed. But as far as its importance to the case. It was a sealed document, was it not? The supplement was sealed? Yes, Your Honor, it was sealed. It wasn't readily available to the defense counsel if they wanted to. They had to get some sort of permission or release from the U.S. Attorney's Office or the judge or someone. And Your Honor, and that's a good point, because Mr. Devorins Counsel could have asked for the document. In order to get the document, someone would have had to ask and get permission to disclose it to him. The fact that it didn't happen, it was an oversight. And as far as the importance of the document, though, I do want to stress this. Compare the supplement to the original plea agreement. The original plea agreement in paragraph eight expressly says. Okay, but to me this is kind of vague language. The government will file a supplement in this case as is routinely done in every case, even though there may or may not be any additional terms. This to me doesn't suggest that if nothing's produced that there necessarily was something. You're suggesting that the defense attorney has an obligation to intuit from this that there's a supplement that the prosecutor hasn't turned over. I think the more correct thing is when you've asked for everything, you should be able to intuit that you've been given everything. All these due diligence cases are cases where somebody produces a big warehouse of documents and the defense counsel doesn't bother to look through the documents. That's not this case. Yes, and Your Honor, let me go back to the language of the plea agreement itself, though. First, it expressly says that a supplement will be filed as is routinely done. But to me this is kind of vague and futuristic. It doesn't suggest to me that there is for sure a supplement. Your Honor, the practice in the Northern District is there's a supplement, as I understand it, in every case. And I'll explain why the language is the way it is. It says a supplement will be filed and then continues and says there may or may not be additional terms. The reason it's like that, as I understand it, is because the supplement is the place that if there were extra terms about particular roles or cooperation, there could be extra terms that need to be under seal to protect someone. No, I get that, but to me this doesn't suggest that there is necessarily a supplement that has terms that should be turned over. And Your Honor, I would disagree about what the language says, but I want to say why this document is filed, the supplement is filed in every case. When you have a case where you need something under seal, if you file something under seal, people know, wait a minute, there's something else out there. So you file it in every case so you can't infer from the plea agreement or the existence of the supplement that there are some special other cooperating terms. That's exactly the reason the defense shouldn't have been suspicious, because the supplement could have said nothing. It could have just said supplement be filed so that we protect this notion that people might be cooperating. I understand the deal about protecting cooperating witnesses from retribution. And so to me, the argument you just made very much supports the notion that the defense counsel didn't have some duty to go and find the sealed document when it could have been a complete nothing. It could have just said supplement and been filed as a blank document. Your Honor, Mr. DeVoren's counsel knew they did not have the document and they knew it existed from the document itself. As far as the importance of the supplement, though, let's not overlook that. Because if you look at the supplement in this case, not the ones in the other cases as to why these documents usually need to be under sealed, compare the supplement in this case to the plea agreement. First, paragraph 7 says, of the original plea agreement, said there was going to be no further charges. That's what the supplement said. Here, the original plea agreement required Darrington to testify about the offense that he's pleading guilty to, which is the same conspiracy with Mr. DeVoren. That's what the supplement said. The supplement was not adding any material terms. And so Mr. DeVoren's counsel knew it existed, had every basis to ask for it, and then when you actually get to the document that was missed, it did not add anything that would have changed the case or changed the material terms. In our reply brief, we've walked through the argument that DeVoren is making, which, again, I want to stress that DeVoren's arguments on appeal are not the same as the findings Judge O'Connor made on the false testimony. But I was just saying, we also have the U.S. Attorney's Office, though, agreeing to a new trial because of a mistake. So you have her own office, not only Judge O'Connor's findings, but you have her own office saying this is a bad enough situation where we concede that there should be a new trial. Your Honor, and that is part of the disagreement or the conflict that my client had with the office, because there were no extra material terms. But with that being said, you're right. The office did agree to a new trial because a document had failed to be produced. They never conceded a Brady violation. And, in fact, if you read the government's response, not just my client's, but the government's response to Judge O'Connor's tentative findings, they say unequivocally. They said they don't believe any false testimony was presented. They don't believe there were any Brady or constitutional violations. What they had was an unfortunate circumstance where a document was failed to be produced, discovered on appeal, and instead of having a lingering issue in the case that could come up in a 2255 proceeding or somewhere else, they said they thought in the best interest of the government, let's just retrial. They never conceded any of the points. And, in fact, I believe if you read the government's positions, although they don't always agree with my client, if you read the positions and the affidavits that were submitted, the government and Ms. Sautter all agree on one thing. There were no constitutional violations. Your Honor, we would ask the Court to reverse the findings against Ms. Sautter. Thank you. Ms. Simonton. May it please the Court. I'm going to start with forfeiture because I know there were a lot of questions on that. And I want to just clear up. It is concerning. I understand how at first blush it could look odd. And that's why I want to focus on that right now. First, I want to begin with Judge Haynes' question. The government does not construe anything that the defense argued below as asking Judge O'Connor to strike forfeiture as a sanction for the alleged misconduct. In fact, the government believes that the defense explicitly disavowed such an argument on pages 2490 through 2491 of the record. And that was, I believe, Mr. DeVorn's sentencing. And the defense said basically we're asking the Court to disallow the forfeiture. And I would like to point out, this is the defense attorney, that this would not even be a sanction against the government for the misconduct. The sanctions have been overruled. What it would be is putting them in the position that they were in after the misconduct, putting the government in the position it would be in. Well, but whatever you want to call it, why not that? I mean, the whole notion of the new trial was to have a do-over. And we didn't have a do-over. We had a do-over that the government benefited from. So we didn't have a go back to exactly where you were, except that now you have the supplemental plea agreement. We go back exactly where you were and now, wham, you've got this extra thing that's going to cost you twice as much as you had to pay in the restitution. That seems like not putting you back where you were. Well, we never committed not to file forfeiture or not to correct mistakes that were made. And vindictive prosecution analysis or sanctions analysis, neither one precludes us from correcting mistakes unless the court were to find for some reason that it does. But I'll start with vindictive prosecution analysis for this forfeiture count. It is very limited in terms of what the government cannot do after a new trial, regardless of the reason why there is a new trial. Case law has never distinguished between if it was the government's fault that there was a new trial or just the district court's fault or some other external circumstance that resulted in the new trial. Instead, you just look at all of the circumstances put together and then you ask, does that create a presumption? And even if there is a presumption, really all the government has to do and what the government did here was proffer objective reasons aside from vindictiveness for the addition of the count. Well, the objective reason is we usually do this and we just forgot, which is also sort of the problem with the supplement. Well, we usually do this and he should have known that and we forgot. And so that doesn't seem like a real compelling reason. Like, well, now that we're getting another bite at the apple, which we're only getting because we screwed up the first time, we found that we screwed up on something else and so we're going to fix that to the detriment of the defendant. It's not an appealing argument to me. I would point the court towards Cresdon. The en banc decision on forfeiture, I'm sorry, on vindictive prosecution, that really is the guiding light for this circuit on vindictive prosecution. Cresdon allows us to do what we did and it shows beyond doubt that the district court's decision was the correct one. And I begin by saying, by just recounting the procedural history of that case. In that case, there was a new trial granted because the court, because the government asked the court to admit into evidence and it admitted into evidence 30 pieces of evidence that it turns out were not admissible. So arguably that was some error on the government's part that contributed to the new trial. In the original panel opinion in Cresdon, so there were two appeals. In the original panel opinion, the court said, you know, that stuff would have been admissible if you had charged conspiracy, but you didn't. You just charged five substantive counts. So only the evidence that relates to those counts should be admitted. So the government on remand adds a conspiracy count to be able to admit that evidence. The district court in that case said, no, that's vindictive. You can't do that. Really it said, it didn't find any bad faith. It just said, that's not a good reason for adding it. So that went up on appeal. The government appealed that. And the original panel in Cresdon affirmed. It said, yeah, that's not a good reason. You have to point to new evidence or some giant changed circumstance that allows you to add something like a new count. And that was a new count of conviction that was added. And this court took that case en banc and created a comprehensive analysis for how you look at vindictive prosecution. And in doing so, it emphasized, one, there are no fixed gauges in determining whether something is vindictive. And it threw away the terminology that the defense relies on here in terms of was a decision made pre- or post-trial? What was the reason for the remand? Things like that. Instead, it created the presumption that we apply now, and that was based on some older Supreme Court case law. But it also pointed to a specific case that was a prior Fifth Circuit case. Specifically, it pointed to that case's examples of reasons that would overcome an idea that an additional count was vindictive. And in that list of reasons, and the prior case was Hardwick v. Doolittle, and the specific citation for this part of the analysis in Cresdorn is in that I have Cresdorn in my brief, but the Penn site is pages 1364 to 1365. Hardwick v. Doolittle listed examples. And some of those examples of things that would prevent a finding of vindictiveness was proof of mistake or oversight in the prosecutor's initial action or a different approach to prosecutorial duty by a successor prosecutor. And what Cresdorn said was reasons like that are enough to prevent a vindictive finding, and because of that, the en banc court went counter to the original panel opinion and said there was no vindictiveness here because there the prosecutor offered a reason that was simply we wanted to get this evidence in and doing it in the way that the original panel opinion said that we could, and that's why we did that. Are you arguing that there is a presumption and you've overcome that presumption, or there's not even a presumption of vindictiveness here? We argue first there was not a presumption because of all the circumstances taken together, it does not create a reasonable probability of vindictiveness. Obviously, we're not talking about actual vindictiveness. The defense has never contended there was actual vindictiveness, so we're looking at whether there's a presumption, Judge Prado, so you are right to look at that. In doing that analysis, you look at the fact that we agreed to the remand. We put in place a new prosecution team. We did not create the second superseding indictment solely to add a forfeiture count. It was to clean it up because, not clean it up, but to make it different because it was a new prosecution team who was coming to this case with different eyes and looked at the case differently as prosecutors can. And then we explained that we added it because it was expected office practice to do so. We also did new financial analysis because it was a new prosecution team, so they looked at the evidence differently and saw that Mr. DeVorn gained a lot more from this fraud than the bank ended up being owed. Now, in the end, the office decided to take what I would call a very mild position on forfeiture, which does count in your analysis, and that is we didn't go after everything we thought that Mr. DeVorn gained, which is usually what we would do in this type of prosecution. The analysis of the government showed that he gained $1.6 million. He used $1.6 million of the bank's funds. But all we ended up asking for was $91,000, and we committed to the court to seek permission from the DOJ to apply that money to his restitution so he may not end up paying anything more than he already did. That is not equivalent to a new count of conviction or a heightened sentence of punishment. So all of that factors into your analysis, and we argue that you should not find a presumption. Even if you found a presumption, though, it's clearly rebutted. What is the purpose of the forfeiture if it's just going to go towards a restitution? I outlined in my brief there are different tools available to collect forfeiture that are not available in terms of restitution, so it can guarantee in certain ways that the victim recoups that money that a restitution judgment would not alone guarantee. I list five different reasons, and we argued that to the district court. The district court, too, I want to point out, adopted the government's arguments. That was his exact words in ruling on this issue. He adopted the government's arguments and statements, and it's written in oral argument on this issue. Although this issue itself is reviewed de novo, any finding of facts reviewed for clear error. Clearly, some of what Judge O'Connor did was implicit fact-finding and adopting our statements because certain statements, like the fact that this is our expected office practice and that the new prosecutor added this because this is what is done in these cases and because of the new financial analysis, those are fact findings. They're tantamount to credibility findings. And this court should not overturn them. Does that same argument apply to the situation of the AUSA about being reckless? No, Your Honor, because we believe that.  No, because what you're looking at there, it's different because it was clear that, for example, there was no materiality, and there, there are no fact findings implicit in that. You know, I've seen umpty, umpty, ump cases where the government concedes some sort of error and then argues it was harmless, and they don't agree to some redo. They come up and they fight the good fight in front of the appellate court. And some of these are rather egregious errors where prosecutors made racist remarks, where they made very inappropriate closing arguments. And so the fact that the government concedes and doesn't pursue the appeal, to me, is a fairly significant event, given the hundreds of appeals I've seen where they could have done that and didn't. So I don't see it as a nothing burger. Yes, Your Honor. We did not concede. In our letter correcting our brief, we did not concede. In the motion which Mr. DeVoren's attorney agreed to, we did not concede. And below, we did not concede. We have never conceded that this was wrong. But you didn't need to. Your actions speak louder than words, is my point. You can say, well, you know, la, la, la, la, we don't think she really did anything wrong. But here we are agreeing to a new trial. And as I said, I have seen case after case after case where something pretty bad happened and they didn't agree to a new trial. And, I mean, I'm not trying to jump on the government. I'm saying that it stands out. It's not as if every time any error is made by any prosecutor, the government comes in and says, oh, let's have a new trial. Yes, Your Honor. I agree. One of the things that distinguishes this case is the procedural history of it in terms of when the supplement was discovered, in terms of when we discovered it wasn't turned over. It was on the eve of argument, after briefing had closed, and the briefing concerned a possible alleged Nepew violation, and the supplement bore directly on that issue. So I agree with you, Your Honor. We would likely not have ended up here if we had discovered that the supplement was not turned over earlier and been able to fully brief it in this court and been able to present the argument in the way that we presented it to the district court. So we knew when we remanded the case that the district court would look at this issue. And we presented our full position on this issue in that court. And not only did he hear from the prosecutor, he also heard from Mr. Darrington at the second trial. We believe after hearing that, but also just an analysis of the evidence in terms of materiality, not just the evidence, but the other ways in which the essence of the supplement was conveyed to the jury in the first trial, none of which are fact findings, he erred in making the determination there was a Brady-Giglio-Nepew violation. Let me ask you this. You had said on the forfeiture that it's not really kind of new money because you're going to use it to pay the restitution. It seems to me we could solve the problem simply by modifying the judgment to say that. I'm not seeing where it says that. I may be missing it. I'm looking kind of quickly here at the judgment. But to me, record page 797 seems to be two different amounts of money, $91,000 to the government, $110,000 to the victims. If what you're saying is you're going to take the $91,000 and use it against the $110,000, then it's not new money, and that seems to end the debate. And shouldn't we just say that? The problem is a procedural one, Your Honor. We can't do that in the judgment. It's not within the court's power to do that. It's the government's. And so, in essence, we've done that by committing to ask the Department of Justice to do this. We can't make the decision in the office. See, I don't see how we can make a decision based upon a promise we can't enforce. Well, it goes. I'll say you don't really make promises. No, but I will say that you look at the collection of circumstances, the context in determining whether there is a presumption of vindictiveness, and that fact. No, I'm going back to the no harm, no foul, because it does seem to me no harm, no foul if it's not new money. If it's $91,000 of $110,000, then there isn't any new money. But if that's not an enforceable promise, I don't see how I can make a decision as an appellate judge based upon a promise that you're saying I can't put in an order because I can't enforce it. That seems problematic. It's not that I don't trust you all. No, I understand, Your Honor. So are you viewing this in terms of the sanctions analysis at that point, in terms of the no harm, no foul, and not the vindictiveness? Okay. So I think one reason, Mr. Can I just answer that question? Is that okay? Sure. Okay. One reason Mr. Page is pushing you to decide this issue under vindictiveness instead of sanctions, other than the fact they didn't raise it in that way in the district court or on appeal, and therefore it waived it, is that he understands the high burden. I would say vindictiveness is a very high burden, too, but I think he realizes even more because it's an abusive discretion standard on sanctions analysis that you're very limited here on appeal in terms of being able to view lopping off forfeiture as a sanction that the district court should have imposed. Thank you. Mr. Page. May it please the Court, on pages 2490 and 2491, the defense argues that the district court should not impose a forfeiture because the government should not be in a better position as a consequence of its constitutional errors in the first trial. That is precisely the same argument made in the ---- But you didn't make it as a sanctions. I mean, the thing that ---- it seems to me that Judge O'Connor said I'm not going to pose a sanction because basically we've righted the wrong and we've put Mr. Wright in a position where he's working back where he would have been. But then you have the problem that $91,000 isn't back where he would have been, unless we buy into this, you know, offset sort of argument that we were just having that we can't ---- Right. And that is precisely ---- Of course. I think that's precisely what Mr. Wright, our lawyer below, said, which is saying what this would be would be putting them in a position that they were after the government's conduct. In other words, the government isn't trying to avoid ending up worse than they were before. The government is bettering their position with no change in the evidence. In other words, he said it's not a sanction because it's not even as bad as a sanction. A sanction would be to put them in a worse position than they would have been as a consequence of its errors. But what do we call that? What legal doctrine would allow us to agree with you if it's not a sanction, it's not vindictive? Well, I mean, you can talk ---- I mean, I've been using the Latin phrase no harm, no foul. That doesn't strike me as probably having a lot of precedent to it. So at least in the judicial arena. So tell me what is the legal theory that supports that argument if it's not sanctions and it's not vindictiveness? Well, I think it is sanctions. We said this is not sanctions because it doesn't put you in a worse position. But there is certainly cases where the district courts impose what they call a sanction and have the authority to impose what they call a sanction, which only puts the government in the same position that they would have been absent the error. So that authority, I think, the government's or the district court's authority to impose sanctions is also its authority to impose, to put the government in the same position that they would have been but for their errors or misconduct. It's also raised as a due process claim, just the fundamental fairness that the government cannot increase the penalty that a defendant suffers or the potential penalty that a defendant suffers as a consequence of its own serious constitutional errors. So what do we do with this we've promised, I don't know, pinky promise to use the money, the forward term money on the restitution? I mean, what do we do with that argument? Well, you modify the judgment. The court should modify the judgment. I said we can't do that. Well, the court can reverse judgments all the time. That would be a remedy for constitutional error, or it would be part of this court's authority to vacate judgments as a consequence of due process error. So what would your modification be to Record 797? It would be to — Because it says it's detailed, blah, blah, blah, the defendant shall forfeit $91,000 to the government, so on and so forth, and a personal money judgment is awarded in favor of the government pursuant to the MVRA. The defendant is ordered to pay restitution in the amount of $110,000 to the U.S. district clerk and so on. Again, with strike everything in front of a personal money judgment of $112 in restitution is the original clause. Right. But that's a little different from they're saying we want to have this forfeiture because we have a bunch of sort of interorum-type ways of collecting this that the But we'll use it towards the restitution. So it — but they're saying we, the Fifth Circuit, can't order that. Are you saying that we can? Of course it can. It can under its authority to vacate judgments, for the same reason it could vacate a restitution judgment, for the same reason that it could vacate any judgment that it believed to arise from error in this case. There's nothing— But this wouldn't be vacating it. It would be modifying. It would be saying, provided, however, that all sums obtained as a result of this use towards the restitution listed below. But Ms. Simiton is saying that we can't do that, and I'm asking your answer to that. 2106. I mean, if memory serves, 28 U.S.C. 2106, which is the — which provides this court the authority to vacate or modify judgments and to determine cases in order to rectify — in order to rectify legal error. I mean, this — the forfeiture part of this stems from, first of all, the constitutional error in the first trial, and second of all, it cannot be — we cannot be sure that it wasn't a consequence of indictiveness. It is erroneous under the Supreme Court and this Court's presumption of indictiveness that follows from similar circumstances as this. And it's erroneous. The Court can strike it because it's erroneous. Or it can vacate the entire judgment and have Judge O'Connor — with instructions to Judge O'Connor to impose — not impose the forfeiture in this case. A couple of things I want to correct in Mr. Hastings' analysis. The first is that the Court's Brady analysis is not limited at all to — its materiality analysis on Brady is not limited to the government's agreement in the plea supplement — conditional agreement in the plea supplement to file a motion for sentencing reduction. That that discussion of the fact that the potential 5K is material appears in its NAPIW analysis, but the Brady finding of materiality is — embraces all of the promises that were made in the plea supplement that are not made in the plea agreement. That includes its agreement that 1B1.8 shall apply to the defendant, which is not at all in the plea agreement, at all. It is only in the plea agreement supplement. There — What about the argument that, look, the plea agreement which you had says, there will be a supplement? Why not say, hey, where's the supplement? Well, that is effectively what the defense counsel is doing when it asks for Jiglio material. Jiglio — why say Brady and Jiglio? Jiglio is a case precisely about the duty of the government to turn over its plea agreements with its — the plea agreements that it has with witnesses. It's about impeachment information, in particular, deals with the government. So while the defense counsel could have been a little more specific and said, and I mean the plea supplement, a reasonable defense counsel would not believe that there is anything material in the plea agreement supplement after, number one, the government represents to him that there is — that you have everything. Not just all Brady material. We have given you everything, is what the record shows, is what the representation was. Number two, there's a discovery order which says all Rule 16 material. There are two discovery orders. And number three, there is testimony from its star witnesses that says we did not make any promises, that says he — that the government made no promises. I don't think a reasonable defense attorney who sees a plea agreement which says there's a plea supplement, it may say nothing at all, it's sealed, would then say, well, I bet the plea agreement — the plea supplement contains additional extraneous promises which are not reflected in the plea agreement. I guess it's almost a last-clear-chance argument. If the defense counsel had specifically said, hey, Ms. Sauter, I see there's this thing about a supplement. You haven't given me one. Is that because it's a blank sheet of paper, or is there not one, or could you please confirm on that? And then she would have gone, oops, kind of like you didn't cause the car wreck, but you had the last chance to break or something like that, so you should have. I think it's — to me, it seems like that kind of argument. I'm not terribly familiar with — Last-clear-chance, you don't do car wrecks. Personal injury — Okay, the idea just being that if you didn't create the situation but you could break and avoid it, then you ought to break, right? Well, I mean, the — You didn't run the red light, but you could break as the guy's running the red light. You had the last-clear-chance. That's the idea. So I think here the argument seems to be if you had been more — or your predecessor had been more diligent in saying what about the supplement, then Ms. Sauter would have gone, oops, and produced it, and we would not be here. Some other panel would have gotten the first appeal. Well, the — I mean, if that's — you look at the Court's opinion in Bagley, which is cited by Sauter's counsel, it disavows any difference in the standard of materiality for material that is the subject of a specific request and material that is not the subject of a specific request. So even if the defendant had not asked for anything, even if the defendant had not even sent a Brady request, it would have been incumbent on the government to produce it if it produced — if it demonstrated facts about the plea agreement which were not in the plea agreement proper. And — and you have to look at the long sequence of events that occurred here, of government conduct that occurred here, which collectively would demonstrate to a defense attorney that it's not — that he doesn't need anything. The government didn't just say, we've given you all our Brady material. It said, we've given you everything, everything that we have. And in those circumstances, I don't see how a defense attorney could — could be expected to ask more specifically about it. I want to cover a little bit about the government's discussion of Cresdorn, if I have a chance. The Cresdorn says that you may look at the government — the court may look at events that occurred since the original charge in order to determine whether or not there is actual vindictiveness. Saltzman later clarifies that this should be what it calls objective information or objective evidence since that. The government's theory that it is merely correcting an oversight or it is engaged in a new analysis of the — of the evidence, if it is cognizable evidence, because it is not objective. That is subjective evidence. That is, we forgot. That is, I looked at this and came up with a different — different idea. It is not an event that changes their — their — the landscape of the case in the way that the event in Cresdorn was, where this court of appeals suggested effectively that they add a charge in order to overcome the evidentiary error. This is nothing like Cresdorn. This has nothing to do with the — with the reason that the case ultimately came back. Adding a forfeiture charge does not correct any error that was arguably made that led to the vacature of the conviction. But if that is cognizable evidence, weigh it against the other objective evidence in this case. Number one, which is that the defendant alleged serious constitutional misconduct. Number two, that that allegation in the — in the appeal led a district court to pick that allegation up and to threaten personal financial liability against an AUSA. That's not something the defense has ever sought in that case, but it does demonstrate that the government may have very strong interests in this case and would — might demonstrate to a hypothetical defendant that a government has strong interest in preventing those kinds of allegations on appeal. In addition, there is no new conduct alleged in the new charge. It is merely a heightened penalty for the same conduct. There is no new evidence suggested. It is merely new analysis of the same evidence, and it is after a vacature. The government suggests that Cresdorn deals away — does away with the distinction between new penalties on — after an appeal and new penalties during plea bargaining. The Supreme Court has consistently distinguished between those two contexts and suggested that after — that new penalties that follow an appeal are much more likely to be vindictive. On another issue, you argue that it was error at trial, and I assume you objected sufficiently, that the checks were described as fraudulent or fraud, whatever. Would you address the harmful error aspect of that? Indeed. This was not merely a — an isolated error in this case. This was — a core part of the government's strategy was to consistently describe these as fraudulent checks and to elicit testimony from witnesses agreeing with that or that — or calling the defendant's conduct fraud in that case. That is either improper expert testimony about mental state or improper lay testimony about mental state, or it effectively redefines the term fraud, which is what the jury ultimately has to find, in terms that do not have a mental state element, which suggests they are — that it is adequate merely to show that the defendant submitted bad checks in that case. There is no way that the jury, going back to remember or recall all this evidence, could recall much of the prosecution's testimony without recalling the witnesses and the prosecutor constantly describing this as fraud, saying that these were fraudulent — these were fraudulent checks. All of the government — none of the government's authority involves situations in which there were so many questions and answers that improperly passed upon the — provided improper commentary on the case. There were — there were scores of them in this case. And they were emphasized at closing. The government first elicited the testimony from Mr. Darrington, does a legitimate loan ever begin with a fraudulent check, which not only labels the check as fraudulent, but essentially says that it is illegal. And then at closing, the first words during the rebuttal were, there are two principles of banking here, which establishes that it's expert testimony. Number one, an officer can't validate a fraud. Number two, no legitimate loan begins with a fraudulent check. So it is not merely that it was pervasive throughout — throughout the evidentiary portion of the trial. It is also that it was very heavily featured by the government at closing. So we would ask that you vacate the conviction and vacate the sentence and or modify the judgment to strike the forfeiture. Thank you. JUSTICE KENNEDY. Mr. Hastings, you think this might have gone differently had it been before another judge in Fort Worth? MR. HASTINGS. Your Honor, I can't speculate on that. But, Your Honor, I do want to start and spend a little bit of time on my rebuttal here on recklessness and why the Court should not defer to the recklessness finding from the district court. First, the judge's recklessness of finding appears in one paragraph. It's on page 1641 of the record. Recklessness, though, is a very high standard. We've cited on page 30 of our opening brief the standard. It's willful and, you know, wanton misconduct. It's conscious indifference. It's not negligence or making a mistake. I don't believe the district judge's findings acknowledge the fact that just mere negligence or making a mistake is not recklessness. But kind of walking through it. This is a judge who's himself been an AUSA, who has a complete understanding of how this kind of thing works and understands the effect of such a finding upon a prosecutor and yet made that finding. Do we not give any deference at all to that? Well, Your Honor, I would like to walk through kind of how we got here because this is a proceeding on remand that had gone sideways as far as Ms. Sautter before she ever had a chance to speak. The remand happened in June of, I believe, 2014. Within less than a week, a show cause order is entered by the district judge, Sua Sponte, to explain why the government agreed to the remand and to explain why the government conceded that false testimony was used. This is the order on page 177 of the record. The government never conceded there was false testimony, so they start off a Sua Sponte proceeding where the judge is accusing the client sponsored false testimony, which was not the truth. Then they have a hearing on July 24th. And by the way, recklessness only comes up in a section 1927 sanctions analysis. It has nothing to do with an APU or a Brady analysis. It comes up in the 1927 sanctions analysis. The order from page 177, the Sua Sponte order, no mention of 1927 or that we're having an analysis of recklessness. Then you get to the hearing on July 24, which is the hearing they have. My client has an opportunity to testify. No mention of 1927 or recklessness in the arguments from the court from my client. Instead, my client takes the stand and says, Your Honor, I made a mistake. It was not intentional. I never intended to conceal anything. No one challenged her on that. Read the cross-examination of that July 24th hearing. Mr. DeVoren's counsel didn't try to say this was anything more than a mistake. There's no attempt to go beyond that. The court didn't ask any questions. The court started this Sua Sponte, but the court didn't ask any questions. The first time we see the recklessness discussion is August 28 when the findings are made. The first time recklessness is mentioned, it's in the 1927 analysis, which the court, once they disclosed the 1927 analysis, we had a chance to say, Your Honor, that doesn't even apply because of prosecutorial immunity. We're going down the wrong line. But that's the first time it appears. Page 1641, the court says the basis for the recklessness is that my client received the letters, the discovery letters that Mr. DeVoren's counsel mentioned that says, Have you given me everything? That's the entire part of the discussion. And if you get a letter that says, Have you given me everything, and you have someone who is a conscientious, hardworking person who thinks they have, getting a letter that says, Have you given me everything? is not telling her, Wait a minute, you missed something. That's not giving her any clue why DeVoren's thinking that something's been missed. They had the document. They had the last clear chance, Your Honor. I thought that question really does go to the heart of it. We're not trying to blame DeVoren's counsel for the situation. It was a mistake. But they could have avoided it. They could have helped out. They could have pointed my client somewhere that she could have located and realized that she missed something. But just missing something is not a recklessness. Does their failure to break excuse her failure to run, her running of the red light? I mean, the problem, you know, that's the problem is that, no, she still shouldn't have run the red light. But, Your Honor, the analogy and the question, the reason why I was saying something about that, is because they could have helped and done something that would have helped my client focus in and realize and catch her mistake sooner. We're not blaming them for the accident. Okay, Your Honor? But we're talking about a recklessness finding. Why is counsel helping the prosecution do its job? It's a nice thought. I mean, it isn't. Well, Your Honor, in our reply brief, and I don't have the page or the case in front of me, we do even cite to a case, actually I think it's Williams v. Scott, but I may have that wrong, where this court's acknowledged that when the defense counsel has a document, sometimes it does have an obligation to correct errors. If someone honestly does not realize they made a mistake, it's not recklessness when you receive a letter that says, Have you given everything? The mental state is, I thought I did. That's what she testified on the stand. That is undisputed testimony. And there's nothing that allows that to rise to the level of recklessness, especially when we have a proceeding like this. Sua sponte, no advance notice that she's going to be on trial for a recklessness violation until that finding's made, and then, of course, we find out that that was heading down the line that leads us to the immunity defense. Your Honor, we'd ask the court to reverse the findings. Thank you very much. Thank you all. The court will take a short break.